THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOAQUIN FERNANDEZ, Defendant-Appellant.

First Department, May 13, 1982

**APPEARANCES OF COUNSEL**

*Bennett M. Epstein* for defendant-appellant.

*Kevin Brennan, Jr.,* of counsel (*Susan Corkery* with him
on the brief; *Robert M. Morgenthau, District Attorney,*
attorney), for respondent.

**OPINION OF THE COURT**

Ross, J.

The predicate for the police activities during the late
evening hours of August 3, 1979, and the early morning
hours of August 4, was an anonymous call to the police
emergency number — 911. The unidentified caller stated
that a 5 foot, 10 inch tall, Hispanic male, with an Afro
hairstyle wearing light blue pants and a light colored T-
shirt, was observed at the intersection of 96th Street and
Amsterdam Avenue, carrying a gun wrapped in a white
shirt. The subsequent radio transmission to officers on the
street relayed that there was a man with a gun at the
aforesaid location and provided the above description.

Two uniformed officers, Joseph Lisi and George Fourcell, who had, respectively, 12 years and 5 years of police service, immediately responded. Both officers recalled receiving this radio message around midnight on August 3. They remembered this detail because they had just started their tour of duty, which commenced shortly before midnight. At the designated intersection, the officers observed approximately five other people standing about, none of whom matched the description provided, and none of whom were carrying a white shirt. The officers then saw defendant walking on Amsterdam Avenue between 96th and 95th Streets in a southerly direction, away from the patrol car. Defendant was carrying a white shirt in his right hand. In addition, he was wearing a white or "light colored" short sleeve shirt, which, after defendant's arrest, was found to be a banlon shirt with a small, round collar. One could easily have assumed this to be a T-shirt.

Officer Fourcell exited from the car and followed defendant on foot. Officer Lisi drove ahead of defendant and saw him turn into 95th Street. Once on this side street, defendant ascended the front three steps of the first building. Lisi emerged from the patrol car and saw defendant bend over and attempt to open the front door with his left hand and, with his right hand, attempt to place the white shirt he was carrying on the ground. At that moment, Lisi approached, his gun holstered, and placed his hand on the white shirt, which defendant was now attempting to discard, and felt a hard object thereunder. The defendant would place emphasis on the fact that this officer did not identify himself, despite the fact that he was in uniform. A few seconds later Lisi's partner approached and, with gun drawn, directed defendant, who was then engaged in a struggle with Police Officer Lisi, not to move. The officers recovered a loaded black .22 calibre revolver from the shirt and it is this physical evidence which defendant seeks to suppress.

Police Officers John O'Connor and Thomas Slater, who were patrolling in an unmarked vehicle, also responded to the radio transmission of a man with a gun. These officers remembered that this incident took place at about midnight of August 3. Arriving at 95th Street and Amsterdam

Avenue, Officer Slater exited the car and ran up the steps to help the other officers who were still struggling with defendant. Slater grabbed defendant by one arm and, as defendant attempted to reach into his waistband, this officer slapped defendant once with his left hand, which was open and not clenched in a fist. Defendant continued to struggle with these officers, who now numbered three, and to curse at them until he was handcuffed and placed into the radio car. Once in this vehicle, and after the appropriate preinterrogation warnings had been given, defendant stated, "I didn't do anything."

Defendant's version of this incident, which was rejected by the jury, differs greatly. At trial, Fernandez asserted that he was at that particular building on West 95th Street at approximately 9:00 P.M. in order to look for an apartment with heat since winter was soon approaching. Apparently, the jury found it difficult to believe that defendant was seeking an apartment with heat during the middle of the summer. In addition, defendant testified that he undertook this excursion at 9:00 P.M., approximately three hours before Officers Lisi and Fourcell came on duty. In any event, he rang the front door bell, and after no one answered, he descended the stairs. He testified that at the street level a man ran up to him and placed a gun to his neck. Defendant maintained that he believed that he was being robbed, despite the fact that the alleged assailant was dressed in a uniform of a New York City policeman and had just exited from a marked police vehicle. Defendant's theory for robbery was based on the fact that he had just learned that the owner of an adjacent dry cleaning establishment summoned the police in order to break up a street fight. Defendant thought that the person who first approached him was one of the combatants in this alleged struggle. However, the officers who testified at trial observed no disturbance on the street, nor did they observe any commercial establishments nearby. In any event, defendant asserted that he did not witness this fight but he did see several people flee. One individual, who ran past defendant, had a "bushy" Afro hairstyle. The defendant also saw this person discard a white object, similar to a white piece of paper. The defendant did not hear a noise as

this white object struck the ground. At this point, a second man approached the defendant holding the white object and struck him several times with the butt of a gun.

Defendant urges that the activities of the police were equivalent of an arrest. We do not agree. The conduct of the authorities on the night of this incident are more closely analogous to a "stop and frisk". Even though an individual is seized, as was the defendant herein, not every encounter of this nature constitutes an arrest. "[W]hen the intrusion involved is of sufficient magnitude, an 'arrest' will be said to occur" (*People v Chestnut,* 51 NY2d 14, 20); here the actions of Officers Lisi and Fourcell were sufficiently limited so that no arrest actually took place.

The officers were responding to a volatile situation of a "man with a gun", and, indeed, this street encounter could have been life threatening. At the described location the officers observed defendant wearing a light colored shirt, and at midnight the color of a shirt and whether a shirt has a small collar, are not features easily discernable. In any event, these officers observed defendant carrying a white shirt in his hand, which conformed to the radio transmission. This transmission indicated that a gun was concealed in the shirt. The officers testified that defendant was the only person on the street at that time who was carrying such an object. The dissent minimizes this fact and places undue emphasis on a height differential and a different hairstyle from that in the radio call. It is common knowledge that descriptions are rarely a picture image of a subject. Even trained observers will disagree, particularly over the height of a person. But these differences do not negate the fact that the police were presented with a situation which required immediate action. At the place stated in the radio transmission, there appeared but one person, out of several others, who generally resembled the description of the man with a gun. This person, the defendant herein, was, as in the description provided, carrying a white shirt. The first officer, who approached defendant, merely touched the shirt, which defendant was attempting to discard, and upon feeling a hard object, his suspicions, and the accurateness of the radio transmission, were confirmed. The fact that Officer Fourcell was the second officer

to arrive, and once there immediately aimed a gun at defendant, who was then involved in a scuffle with his partner, does not elevate this stop to an arrest. As this court has previously stated: "There is in any frisk the element of a seizure, since an individual's movement is curtailed and his person is subject to touching by other persons. But it requires more than an impairment of mobility to elevate a stop into an arrest. We are unaware of any statute or decisional authority that states that there is only one constitutionally acceptable manner of accomplishing a frisk" (*People v Chestnut,* 69 AD2d 41, 47-48, affd 51 NY2d 14). In *Chestnut (supra)* the encounter with the police involved a more restrictive intrusion than is presently before this court. There the police were responding to a radio run of armed robbery. After the authorities concluded that the defendant matched the description provided, they approached, with guns drawn, and ordered defendant and his two accomplices to lie face down on the ground. This court concluded, and the Court of Appeals later agreed, that the confrontation in *Chestnut* was a stop and frisk. The act of drawing a gun, as Officer Fourcell did, was a reasonable response to the facts known at the time by these participants and does not elevate this stop to an arrest.

Our conclusion that the actions of the police did not amount to an arrest does not complete our analysis. There remains to be considered the question of whether the actions of the police were justified under all the circumstances presented. We have been instructed that: "Courts simply must not * * * attempt to dissect each individual act by the policemen; rather, the events must be viewed and considered as a whole, remembering that reasonableness is the key principle" (*People v Chestnut,* 51 NY2d, at p 23). Based upon this standard, we believe that the conduct of these police officers was indeed reasonable. It must be remembered that the springboard for the police action was a radio run of a man with a gun. As indicated, when Officer Lisi stopped the defendant, he merely touched defendant's hand, the hand which grasped the concealed gun. The officer then felt a hard object under the hand held shirt and a gun, containing five rounds of ammunition, was seized.

Once these facts became known, defendant was properly arrested. The yardstick against which this conduct must be measured is not absolute certainty but, as previously stated, the test is reasonableness. *Terry v Ohio* (392 US 1, 27) permits: "[a] reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Here, the officers were aware that a person was walking on Amsterdam Avenue at midnight carrying a concealed weapon. It can be said with a reasonable degree of certainty that these officers, under these circumstances, feared for their own safety and for the safety of innocent bystanders who could have been on the street at that particular time. The intrusion was minimal when considered in relation to the possible dire consequences of not effecting a stop.

The dissent would dissect the actions of the police, a practice which is not looked upon with favor, and isolate two facts concerning defendant's physical characteristics and suppress the gun which was seized. This is improper for it fails to consider the over-all street situation as it existed and which justifies the conclusion that the safety of the officers or others was endangered. Their response, which was limited in scope and in the degree of intrusion, was both reasonably related to the situation as it existed and reasonably calculated to protect the rights of the defendant. To conclude that the conduct of these officers was anything but reasonable, as the dissent urges, would require an officer "to await the glint of steel before he can act to preserve his safety." (*People v Benjamin,* 51 NY2d 267, 271.) "The police officer is not an actor in a Hollywood scenario, where the quick draw of the gun provides exciting entertainment for the viewers. Rather, the police officer is experiencing the dangers of the real world where the Marquis of Queensberry rules do not apply." (*People v Rivera,* 78 AD2d 327, 331, app dsmd 54 NY2d 1021.) Such

an onerous burden should not be placed on those who serve to protect the lives and property of each one of us.

We have reviewed defendant's remaining contentions and find each to be without merit.

Accordingly, the judgment of Supreme Court, New York County (LEFF, J., at suppression; GREENFIELD, J., at trial), rendered April 22, 1980, convicting defendant, after trial by jury, of criminal possession of a weapon in the third degree, and sentencing him to an indeterminate term of from two and one-half to five years' imprisonment, should be affirmed.

MILONAS, J. (dissenting). I would reverse the conviction. In my opinion, the physical evidence should have been suppressed.

This is an appeal from a judgment entered on April 22, 1980, in the Supreme Court, New York County (LEFF, J., at the pretrial hearing; GREENFIELD, J., at trial) convicting defendant, after a jury trial, of criminal possession of a weapon in the third degree, and sentencing him as a second felony offender to imprisonment for a period of from two and one-half to five years.

Defendant's conviction arose out of his arrest on August 4, 1979 for possession of a loaded .22 calibre pistol. According to the testimony of the arresting officer at the pretrial hearing, he and his partner were on patrol at or about midnight in their police car when they received a radio transmission that there was a man on Amsterdam Avenue between 95th and 96th Streets reportedly carrying a gun wrapped in a white shirt. The man was described as being Hispanic with an Afro hairstyle, 5 foot, 10 inches tall and wearing light blue pants and a light colored T-shirt.

Defendant was observed walking south on Amsterdam Avenue between 96th and 95th Streets. Although there were other people on the street, none of them purportedly resembled the description or was carrying a white shirt, except for the defendant, who did have such a shirt in his hand. He was, however, approximately 5 feet, 6 inches in height, had wavy hair and was wearing a short sleeved, light colored banlon shirt with a collar.

The arresting officer further stated that he followed the defendant to a building on 95th Street between Amsterdam and Broadway. The defendant appeared to be about to enter, his left hand extended in the direction of the exterior door, his body bent at the waist and knees and his right hand downward towards the ground. The officer, in uniform, ran up behind him and, without identifying himself, grabbed the hand holding the white shirt and felt a hard object, thereby discovering the gun. His partner, at that exact moment, had a gun placed against the defendant's head and exclaimed, "Don't move".

The radio message, based upon an anonymous 911 call, was admittedly the only information upon which the officers relied to stop the defendant. There was nothing unusual occurring at the scene, nor had they heard of any shooting. In addition, the defendant did not do anything which could be remotely construed as furtive or suspicious.

As a result of these facts, the court at the pretrial hearing determined that the police had acted properly and that the arrest was incident to a lawful seizure.

In *People v La Pene* (40 NY2d 210) officers on motor patrol had received a radio message, based upon an anonymous tip, that there was a male Negro with a gun in a place called Jean's Bar and that he was wearing a red shirt. When the police entered the bar, they noticed the defendant, who was dressed in a red shirt, standing in the back of the establishment with his hands in his pocket and apparently engaged in conversation with some other patrons. Without attempting to verify or substantiate their information, the officers ordered the defendant to "freeze". They then proceeded to frisk him, recovering a pistol containing seven live rounds.

Holding that the intrusion involved was unreasonable, the Court of Appeals referred to the absence of any furtive or suspicious conduct on the part of the defendant or of any indication, such as a bulge, that he was armed. The court stated that the People could not rely solely on an anonymous phone call to furnish sufficient cause to support the police action. The information in question had not only been supplied by a person whose identity was unknown,

the court asserted, but it was also communicated by a nonpersonal medium. "Tips of this nature are of the weakest sort since no one can be held accountable if the information is in fact false" (*People v La Pene, supra,* at p 224). Distinguishing between a report that a person has a gun in his possession and another account containing the additional fact that the weapon has just been used in connection with the commission of a crime, the court declared that a tip about an individual with a gun will not, by itself, authorize the sort of police activity that occurred there.

In *People v Stewart* (41 NY2d 65) the arresting officer testified to a radio message concerning a Negro male with a gun, wearing a long green coat, who was in front of a given location. The defendant, dressed in a long green coat, was found at the stated address in the company of four or five other men. When the officer called for the defendant to stop, he approached the police while the other persons continued walking. According to the officer, the defendant's coat was unbuttoned, and he was able to spot a bulge in the left front trouser pocket which could not be identified as a gun and, in fact, was not a weapon. However, without further inquiry, the officer conducted a further frisk which revealed eight .38 calibre bullets and a loaded revolver.

The court, in reversing the conviction, pointed out that "where an anonymous phone tip giving a general description and location of a 'man with a gun' is the sole predicate, it will generate only a belief that criminal activity is afoot * * * That type of information will not of itself constitute reasonable suspicion thereby warranting a stop and frisk of anyone who happens to fit that description * * * In that situation, the police have only the common-law power to inquire for purposes of maintaining the *status quo* until additional information can be acquired" (*People v Stewart, supra,* at p 69).

Similarly, in *People v Benjamin* (51 NY2d 267, 270), the Court of Appeals noted that "an anonymous tip of 'men with guns', standing alone, does not justify intrusive police action, and certainly does not rise to the level of reasonable suspicion warranting a stop and frisk". Although the court sustained the pat-down search which had taken place in

*Benjamin,* it noted that it was the personal observations by the police of the defendant's stepping back while reaching with both hands to the rear of his waistband, where a weapon might be concealed, together with the information furnished in the radio run, which provided the reasonable suspicion necessary to support the limited intrusion which produced the loaded revolver.

In the instant case, the radio transmission which the officers received was not only derived from an anonymous source, but was incorrect in all material respects, except for the defendant's having a white shirt in his hand. The physical description supplied in the message did not conform to that of defendant, nor was he wearing the type of clothes mentioned. In effect, the only valid information which the police possessed was that of a man on Amsterdam Avenue between 95th and 96th Streets, carrying a gun wrapped in a white shirt. There was no report of any crime having been perpetrated with the gun, no sign of unusual activity in the area, and no menacing movements on the defendant's part. The defendant's behavior was, if anything, indicative of a possible attempt to discard the shirt containing the gun by laying it on the ground, contrary to the situation existing in *People v Benjamin (supra)* where the officers could realistically perceive themselves to be in imminent danger. Yet, the police here made no effort to investigate further; one officer simply grabbed the hand holding the shirt, while the other placed a revolver to the defendant's head. Under such circumstances, the police intrusion was excessive and, in fact, the defendant was placed under arrest for merely holding a white shirt. Moreover, there was not even a basis for the reasonable suspicion required to justify a stop and frisk.

In those cases in which limited searches have been upheld, the description contained in the radio run was either precise or there was present some other factor, totally lacking here, to support the police conduct. (See *People v McLaurin,* 43 NY2d 902; *People v Kinlock,* 43 NY2d 832; *People v Stroller,* 42 NY2d 1052; and *People v Williams,* 41 NY2d 65.) Consequently, the motion to suppress the physical evidence should have been granted.

Although the arrest was, in my opinion, defective, and it is therefore unnecessary to decide whether, as defendant alleges, the Judge below committed reversible error, in refusing to admit at trial the contents of the radio message, I believe that this issue merits a brief discussion. The defense contention was that the police found the gun on the sidewalk and not in the defendant's hand, as the officers claimed, and arrested him only because he was the nearest person with a superficial resemblance to the individual who they were seeking. Thus, the question of defendant's identity was crucial, and proof of the description provided to the police was relevant to a consideration of this issue. That being the situation, defendant asserts, the evidence was exculpatory and should have been allowed under either the "state of mind" or *"res gestae"* exception to the hearsay rule.

I agree that evidence of the description given to the police should have been admitted. The defense case was severely hampered by its inability to demonstrate the disparity between the physical characteristics and clothing attributed to the "man with a gun" in the radio transmission and that of the defendant. At trial, the court concluded that the information supplied through the radio run was hearsay, that the informant was unknown and, consequently, that the source and reliability of the facts contained therein was uncertain. However, this very same unreliable information, obtained from an undetermined source, had, without more, previously been held sufficient to authorize the police intrusion.

In my view, while the evidence in question may not fall squarely within a hearsay exception, the rule should be relaxed under modern trends. The information sought is exculpatory, was not generated by the defendant or anyone who had a motive to assist him and has probative value for the purpose offered. Of course, the weight to be given to this evidence is a matter for the jury to assess. Consequently, the court was in error in excluding testimony as to the description provided in the radio transmission.

KUPFERMAN, J. P., and SULLIVAN, J., concur with ROSS, J.; FEIN and MILONAS, JJ., dissent in an opinion by MILONAS, J.

Judgment, Supreme Court, New York County, rendered on April 22, 1980, affirmed.