■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN VOLPE, Appellant. — Judgment of conviction by plea of guilty of criminal possession of a controlled substance, fifth degree, rendered March 19, 1981, Supreme Court, New York County (Fitzer, J.), after denial of a motion to suppress physical evidence (Moldow, J.), affirmed. The outstanding stay of execution of sentence is vacated, and defendant-appellant directed to surrender. The facts are fairly stated in the dissent and require little comment. Even the dissent seems to concede that there were sufficient grounds to induce a court to issue a search warrant; however, there was good and sufficient reason not to apply for one. The conduct of the police in using the volunteered service of defendant-appellant's visitors to gain entrance was eminently proper, and has no connection whatever with authority to permit access either to the apartment or to the building. It is misleading to endeavor to equate an offer to knock on a door with an assumed grant of authority to enter an apartment. The Federal agent was legally in the building's public hall on official business having nothing to do with defendant. He did not go there to eavesdrop, and his involvement in this case was completely serendipitous. Nor does the appellant have standing to complain that the police invaded the rights of the two visitors by questioning them; indeed, there was no invasion of their rights at all, and a positive duty to make inquiry of them. After *Miranda* warnings, they responded freely, and offered to knock at the apartment door. The dissent does not dispute that the officer saw contraband in plain view through the open door as defendant responded to his erstwhile visitor's knock, and thus acted properly on entering to seize the illegal substances. Considering all the circumstances together, the police conduct was reasonable and responsible. The Federal agent had communicated to fellow law enforcement officers his well-founded belief that traffic in guns and controlled substances was going on behind the door of defendant's apartment, and they had a clear duty to respond to that information. That part of the conversation heard through the door, apparently conducted partially over the telephone, patently concerned illegal substances; this was corroborated in a few moments when the two men came downstairs and were interviewed. An informed appraisal of the situation as it was on the heels of the conversation with the two visitors must lead to the conclusion that what the police then did was dictated by the circumstances. The police had no ground whatever to hold further the two men who had responded to their question. They could not detain them while they sent for a warrant. The two had stated that they were friends of the men behind the door. Obviously, there was a phone in the apartment, and it would have been sheer folly for the police to have risked a phoned warning by the two visitors that the officers were outside waiting to get in. The contraband would have been flushed away long before an affidavit could be drawn in support of a warrant. To any reasonable mind, this presented an exigent situation. Very little further need be said except that appellant makes two points, which should not be overlooked. One is to the effect that defendant's privacy was invaded by eavesdropping. As to

this, it would seem that anyone who talks inside an apartment loud enough to be heard through the door in the public hall cannot really be believed to have an expectation of privacy. The other makeweight is to point out that the police displayed weapons — prudently, it must be said, in the face of the conversation with accompanying sounds indicating presence of what any policeman would have identified as a .357 Magnum handgun. Undue stress is laid upon the fact that one of the weapons displayed was a shotgun. It certainly inspired no terror in defendant; neither did it induce him to respond in any inculpatory manner. Concur — Sullivan, Ross and Markewich, JJ.

Kupferman, J. P., and Milonas, J., dissent in a memorandum by Milonas, J., as follows: I would reverse the conviction. In my opinion, the physical evidence should have been suppressed. This is an appeal from a judgment, entered March 19, 1981, in the Supreme Court, New York County (Fitzer, J., at plea and sentence; Moldow, J., at the pretrial hearing), convicting defendant, upon his plea of guilty, of criminal possession of a controlled substance in the fifth degree and sentencing him to an indeterminate term of incarceration of from one to three years. Execution of sentence has been stayed pending appeal. Defendant's conviction arose out of an incident which occurred on the afternoon of June 1, 1979 when Special Agent Marvin Siegal of the drug enforcement went to an apartment building at 308 East 18th Street in Manhattan to serve a subpoena on a resident on the fourth floor. He did not recall how he entered the building from the street, or whether the outer door was locked. When Agent Siegal failed to gain entry to his destined apartment, he walked downstairs. On the second floor landing, as he passed by the door of apartment 2A, he overheard a conversation taking place inside. Agent Siegal stated that he overheard someone ask, "[h]ow much" and another person reply, "[a] thousand dollars," and then "[t]his .357 is too big," followed by "[t]his is what they used in and wore at their side in World II." He was not certain whether there were two or three persons engaged in the conversation but believed the subject to be about guns. Agent Siegal thereupon departed the building and located Police Officer Jerry Corbo on the street. After informing Corbo of what had transpired, Siegal accompanied by Corbo and two other officers, returned to the hallway outside apartment 2A. From within, they heard the telephone ring and a muffled voice speak into it. According to Agent Siegal, someone inquired "[i]s it cool to talk on the phone?" and another person uttered "[w]ell, you can use black shirts for black beauties and white shirts for amphetamines." A voice, which he later recognized as the defendant's, mentioned the word "coke" and asserted, "[i]f you use codes the Grand Jury can't do anything to you." Officer Corbo testified that someone said into the telephone, "[i]f we say white shirts and black shirts the Grand Jury can't indict us," and then somebody stated, "[a] 7.65 millimeter is okay but I will take one of these anytime." There was also the sound of the action of a gun being cocked several times. Agent Siegal and the police officers went back to the ground floor of the building. A moment later, two people left apartment 2A and came downstairs. Agent Siegal detained them, identified himself and advised them of their constitutional rights. Upon being questioned as to what they had been doing in the apartment, they explained that they had been visiting a friend. One of them also declared that they had unsuccessfully attempted to purchase "quaaludes" there. Officer Corbo stated that one of the men offered to escort the police officers to the door of the apartment and knock on it. Officer Corbo and several other policemen thereupon accompanied him upstairs. At least one of the officers was carrying a shotgun, which was drawn as the man rapped on the door. As the door was opened by the defendant, Officer Corbo had a view of the interior of the apartment. Directly in front of the door he observed a table;

a second table was located on the left side of the room. Resting on the two tables were a "three-beam scale", boxes and jars of pills, a plastic bag with white powder, and wóoden cigar boxes without lids containing marihuana, and "various jars containing different colored pills and tablets." The officers then entered the apartment, where Officer Corbo noted a sawed-off shotgun and a carbine rifle leaning against a closet door, as well as other boxes and jars situated along a wall of the apartment. Agent Siegal testified that when he subsequently arrived on the scene, he saw jars, boxes, vials with pills, and what appeared to be marihuana, some plastic bags with white powder, scales and one or two rifles or shotguns. The defendant was thereupon placed under arrest and the contraband seized. However, the defendant claimed that when he opened the door to his apartment, he saw the face of one of the men who had just departed. The next thing he knew, the door was being pushed in, and a shotgun was pointed against his chest. Even assuming that Agent Siegal was in the building lawfully, and he testified to having no memory of the means through which he gained entry, and assuming that the information obtained by him as a result of the overheard conversation could be used as the basis for further action, there is still the issue of whether there existed such exigent circumstances as would justify the ensuing warrantless search and seizure. (*Payton v New York,* 445 US 573.) Until the police made their way to apartment 2A, the defendant had no knowledge whatever that either he or his home were the object of police interest. There was, thus, hardly a danger that tangible evidence was in imminent danger of being destroyed, nor was the suspect in the process of fleeing or likely to take flight in the near future, nor was there any basis for concluding that anyone's life was in jeopardy. Therefore, none of the reasons for invoking the exigent circumstances exception to the requirement that searches and seizures be undertaken pursuant to a warrant was available to the officers in the instant situation. (See *People v Clements,* 37 NY2d 675, cert den *sub nom. Metzger v New York,* 425 US 911, wherein the Court of Appeals found that the seizure which occurred in that case was conducted to prevent the threatened disappearance of tangible evidence.) Moreover, the police presence in and around the building was considerable, so there would have been no opportunity for the defendant to escape undetected. Nor can the "plain view" doctrine be reasonably applied. There was no evidence introduced to demonstrate that the man who purportedly volunteered to take the police to the apartment had the requisite degree of authority and control over the premises to permit legal entry. (See *People v Cosme,* 48 NY2d 286.) While the officers may have possessed reasonable suspicion to believe that there was criminal activity afoot, the overheard conversations alone cannot be deemed sufficient probable cause to arrest. Yet, when the police officers approached defendant's apartment door, at least one of them was armed with a shotgun which was raised at the defendant as he opened the door. This is scarcely an instance of contraband being in plain view in premises to which the police have gained legitimate access. If we sanction officers forcing themselves into an individual's apartment merely because they have overheard an incriminating conversation, then we permit the diminution of the protection afforded against unreasonable searches and seizures. While there is clearly a degree of inconvenience and delay involved in procuring a warrant, this is a slight price to pay for the continued strength of our constitutional guarantees. In *People v Lee* (83 AD2d 311), this court recently decided that the mere presence of narcotics, without more, is not such an exigent circumstance as would permit entry into private premises without a proper warrant. The rationale underlying that decision is equally applicable to all contraband, including weapons. Unless there is some ground for believing

there is an immediate risk that the tangible evidence would be disposed of or that the suspect might flee or that there is a peril to human life, the officers are under a constitutional duty to obtain a warrant before undertaking any search. Since none of these factors was present here, the warrantless search and seizure was improper, and the physical evidence seized should have been suppressed.