■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MIGUEL GUTIERREZ and JOSE RIVERA, Respondents.—Order, Supreme Court, Bronx County (Irving Lang, J.), entered on June 10, 1985, granting defendants' motions to suppress physi-

cal evidence, and dismissing the indictment, reversed, on the law, the motions denied, the indictment reinstated and the matter remanded for further proceedings.

The factual recitation which follows is taken from the transcript of the suppression hearing. On January 23, 1985, at approximately 10:30 A.M., uniformed Officers Febus and Berman were on routine motor patrol in a marked radio car when they espied another marked patrol car in front of 1652 Popham Avenue. After observing two uniformed officers exit from that vehicle and run into the lobby of 1652 Popham Avenue, Officers Febus and Berman parked their car and ran after them into the building, which was apparently a location known for narcotics trafficking and violent crime. Officer Febus testified that he himself had made three arrests in the building and had heard of approximately 100 narcotics-related incidents that had taken place there.

As Officers Febus and Berman entered the lobby, they observed several male Hispanics inside, including defendants Gutierrez and Rivera. The lobby had stairways on the left and right sides leading to common upstairs hallways. Two of the individuals were already running up the right staircase pursued by the other officers. Defendants Gutierrez and Rivera were standing "zero feet" from the left staircase, which they could have "run straight up." Rivera was holding a brown paper bag in his right hand at waist level.

Officer Febus yelled "Police, halt." Defendants looked briefly at the officers and then began to run up the left staircase. Officers Febus and Berman gave chase. As defendants ran, several glassine envelopes containing white powder fell out of the bag which Rivera was carrying. At the fourth floor, defendants entered the hallway and ran into apartment 4B, leaving the door ajar. The officers followed defendants into the apartment moments later to observe Rivera attempting to stuff the brown bag he had been carrying into a black canvas sports bag held by Gutierrez. Officer Berman took the sports bag from Gutierrez, while Officer Febus seized the paper bag from Rivera's hands. As they patted down and handcuffed defendants, the officers observed two strainers, a triple-beam scale and a knife on the table "right next" to where defendants were positioned. Each of these items, in addition to the sports bag and the paper bag, which was found to contain cocaine, was vouchered by the officers.

Both defendants testified. They were asleep in the apartment when two police officers entered the premises, awakened

them and placed them against the wall. The officers broke the lock on the closet door and took out a blue metal box which defendants had never seen before. The officers broke the box and removed several small glassine envelopes. The police also found a scale and two strainers in the apartment. Defendants had never seen these items before either. According to Fernando Castean, who resided at apartment 4B and with whom defendants lived, a man known as Jose had brought a blue box to the apartment on the morning of January 23, 1985 and left it in the closet, which he then locked.

The suppression court granted defendants' motions to suppress the physical evidence. Although crediting the testimony of the People's witnesses in all respects and rejecting the testimony of the defense witnesses, it found that the case was "basically a combination of People against Howard and People against Cantor", and concluded that Officer Febus' order to defendants to halt "constituted a seizure without probable cause." The court noted, further, that although the police, under the circumstances, had the right to make inquiry of the defendants in the lobby of the building, they did not have the right to follow them. We disagree and, accordingly, reverse, deny suppression and reinstate the indictment.

On appeal, the People argue that Officer Febus' order to halt was lawful because of the peril the officers believed existed when they saw their fellow officers running into the building and chasing fleeing suspects up the stairs. Additionally, the People argue that when defendants ignored the order the officers had the right to pursue them to insure the safety of their fellow officers. We believe that, under the circumstances, the command to halt was not unreasonable, and that defendants' precipitous flight up the stairs at a time when their fellow officers were already pursuing fleeing suspects justified the officers' chase of defendants.

Clearly, "[a]n individual to whom a police officer addresses a question has a constitutional right not to respond." *(People v Howard,* 50 NY2d 583, 586.) "He may remain silent or walk or run away * * * [and] the police officer * * * may not pursue, absent probable cause". *(Supra,* at 586.) Thus, any citizen is free to ignore a police officer's question; he does not have any obligation to respond to police inquiries. Here, however, defendants were not asked any questions, were not requested to provide any assistance, and, contrary to the suppression court's finding, were not seized.

Having seen their fellow officers run into a building known for narcotics trafficking and violent crime, and having seen

them chase fleeing suspects up the stairway, and having suspected that their brother officers were embarking on a dangerous police action, Officers Febus and Berman found themselves in the heat of a rapidly escalating and obviously potentially dangerous situation. Forced to make a split-second judgment as to what was transpiring, they attempted to curtail defendants' movement until the danger had passed or, at least, been ascertained. Had defendants not done anything else, and even refused to answer any subsequent questions posed to them, they could not have been frisked, searched or arrested.

Defendant Gutierrez notes that Officer Berman conceded that he had not seen either defendant engaging in a narcotics transaction, and thus argues that there was no reason to halt defendants. Yet, the mere absence of a specific criminal act on the part of defendants cannot be viewed in a total vacuum. The first two officers into the building were observed chasing some of the lobby dwellers up the right staircase. While defendants' presence in the building, a known center of drug activity, could easily have been innocuous and coincidental, in light of the peril known to exist in the common hallways to which both stairways led, the officers did not have to place themselves or their fellow officers in a precarious situation by ignoring defendants altogether. Whether a police officer's conduct is reasonable "must necessarily turn on the facts in each individual case." *(People v Green,* 35 NY2d 193, 195.)

That Officer Berman had his gun drawn did not escalate the command to halt into an arrest. "[T]he predicate established defines the scope of permissible police conduct." *(People v Stewart,* 41 NY2d 65, 66.) The predicate here was not an ill-disguised pretext to search defendants, but rather a clear sense that a potentially dangerous incident could erupt. The officers were taking steps to prevent the outbreak of violence. They were confronted with too many uncertainties to ignore defendants. "We ought not, in deciding what is reasonable, close our eyes to the actualities of street dangers". *(People v Rivera,* 14 NY2d 441, 446.)

Nor do we find the officers' pursuit of defendants up the stairway to have been inappropriate in the circumstances presented. Again, the officers' conduct must be placed in context. *(See, People v Leung,* 68 NY2d 734.) In addition, it should be remembered that their testimony was fully credited, and defendants' version wholly discredited. The officers were in uniform, did not threaten defendants, and did not attempt to frisk them. Notwithstanding, as soon as they ordered defen-

dants to halt, defendants ran up the stairs to the second floor, where their former lobby companions and the other police officers had already run. While defendants' conduct was not criminal in nature, the officers had the right to follow them because of a perception that their fellow officers might be in danger, or at least to remain in control of a dynamic situation, rife with the potential for violence. Fellow officers were already chasing suspected miscreants up the staircase of a building known for the criminal activity that occurred there. While Officers Febus and Berman did not know whether defendants or their compatriots were armed, they certainly knew that the safety of their fellow officers was in jeopardy. In such circumstances, they would have been derelict in their duty had they allowed defendants to run up the stairs while the situation was still in flux, particularly if one of the defendants subsequently fired a gun. Thus, their concern for the safety of their fellow officers, the propriety of whose conduct has not been challenged, justified the officers' pursuit of defendants. In any assessment of the reasonableness of police conduct we must not forget that "[c]onstitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life". *(People v Mitchell,* 39 NY2d 173, 180, citing cases.) "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *(Warden v Hayden,* 387 US 294, 298-299.)

The subsequent actions of Officers Febus and Berman leading to the seizure of the narcotics and drug paraphernalia were entirely proper. After observing glassine envelopes containing white powder drop from defendant Rivera's bag, probable cause for his arrest existed. (CPL 140.10 [1] [a]; *People v McRay,* 51 NY2d 594.) Thus, the officers' continued pursuit of defendants to apartment 4B was justified to complete the arrest. Their entry into the open apartment was clearly warranted by the exigent circumstances *(Payton v New York,* 445 US 573), and, once inside, they properly seized the bag containing the glassine envelopes as well as the drug paraphernalia in plain view. *(See, People v Hearns,* 98 AD2d 690; *People v Volpe,* 89 AD2d 510, *affd* 60 NY2d 803.) Concur— Kupferman, J. P., Sullivan, Ross and Milonas, JJ.

Rosenberger, J., dissents in a memorandum as follows: When Officers Berman and Febus followed their fellow officers into the apartment building at 1652 Popham Avenue, Officer Berman drew his gun before entering the lobby. Later at the

hearing, he could not recall whether the officers he was following had drawn their weapons. As Officers Berman and Febus entered the lobby, they observed their fellow officers chasing several people up the right staircase. Officer Febus then shifted his attention to the people standing in the lobby, where he noticed two men (defendants Gutierrez and Rivera) standing at the bottom of the left staircase. Defendant Rivera was holding a brown bag from which, Officer Febus testified, "it appeared like he was taking stuff out." Officer Febus yelled, "Police, halt", while Officer Berman, his gun drawn, stood at his side.

The hearing court concluded that Officer Febus' order to halt was not merely an inquiry, but constituted a seizure without probable cause. The court credited the officers' testimony concerning the events leading up to the defendants' arrest, but found no reasonable basis for their actions. Relying upon *People v Howard* (50 NY2d 583 [1980]) and *People v Cantor* (36 NY2d 106 [1975]), the hearing court concluded that the evidence subsequently seized was the unlawful product of an illegal seizure of defendants, and, accordingly, granted respondents' motions to suppress. The majority disagrees with this conclusion, stating that Officer Febus' order to halt did not constitute a seizure and was lawful because of the peril the officers believed existed when they saw their fellow officers running into the building chasing several men.

Initially, we note our agreement with the hearing court that the defendants were seized within the meaning of the State and Federal Constitutions (US Const 4th Amend; NY Const, art I, § 12). The "halt" command by Officer Febus, coupled with the sight of Officer Berman with his gun drawn, demonstrated that the defendants' freedom of movement was significantly restrained. "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment". *(People v Cantor, supra,* at 111; *see also, People v Jennings,* 45 NY2d 998 [1978]; *Terry v Ohio,* 392 US 1, 16 [1968].)* The test for determining whether a police encounter amounts to a detention is an objective one of deciding whether a reasonable person would believe he was not free to walk away. Some of the factors which strongly suggest such is the case are, "the display of a weapon * * * and language or tone indicating a show of authority that may compel compliance with the officer's request." *(United States v Sugrim,* 732 F2d

25, 28 [2d Cir 1984].) Clearly, the defendants were seized by Officers Berman and Febus.

The principle is firmly established that a police officer has no right to attempt to seize an individual in the absence of probable cause. To establish probable cause, there must be evidence available to the police officer sufficient to lead a person of his experience and sophistication reasonably to conclude that a crime had been or was being committed. *(People v Foster,* 83 AD2d 282, 285 [1st Dept 1981].) "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away * * * [and] the police officer * * * may not pursue, absent probable cause" *(People v Howard, supra,* at 586). *Howard* also established that where only a common-law right of inquiry exists, a defendant's flight is insufficient to establish probable cause.

When Officers Berman and Febus first saw the defendants, they were standing at the bottom of the left staircase looking into a brown paper bag. There had been no communication between any of the officers to link the defendants with the other individuals being pursued. The People concede that Officers Berman and Febus did not have any reason to suspect that the defendants had committed a crime. In a footnote, the People state that "certainly, the fact that respondent Rivera was carrying a plain brown bag was innocuous", and "nor was the fact that respondents were standing by the left staircase while a chase proceeded up the right sufficient to form any degree of suspicion upon them." Therefore, "[w]ith no inkling that criminal activity was afoot * * * there was no articulable reason for the police even to have questioned [defendants]" *(People v Cornelius,* 113 AD2d 666, 669 [1st Dept 1986]).

The majority states that Officers Berman and Febus "found themselves in the heat of a rapidly escalating and obviously potentially dangerous situation", and, thus, that they were justified in stopping the defendants. However, the facts do not support this notion of "danger" either. Defendants were standing motionless at the bottom of the left staircase, looking into a paper bag. Neither Officer Febus nor Berman testified that defendants made any furtive movements, or had what appeared to be a gun; indeed, the defendants were not even looking at the police officers. Moreover, the police officers that Febus and Berman had followed into the lobby were by then on another floor of the building. Therefore, there was no basis for determining that these particular individuals were danger-

ous and posed a threat to either Officers Febus and Berman or the other officers in the building.

As determined by the hearing court, the facts of this case are properly governed by *People v Howard (supra,* at 590), in which the Court of Appeals stated that officers who "had no information that a crime had occurred * * * had not seen defendant do anything criminal, and were confronted only by facts susceptible of innocent interpretation", could not seize or detain him.

We next consider whether the unlawful seizure tainted the discovery of the drug paraphernalia. *Howard (supra,* at 586) established that contraband discarded during an illegal pursuit may not be recovered as "abandoned", but is susceptible to challenge as the product of unlawful police conduct. In *People v Boodle* (47 NY2d 398 [1979]), defendant was detained in a police car and questioned. While he was being driven around, defendant threw a gun out the car window. He was then taken to the station house, where he was searched. The search revealed envelopes containing heroin. Defendant sought to suppress the gun and the heroin. The Court of Appeals held that the defendant had been seized without probable cause, but defendant's act of throwing the revolver was not in "direct and immediate response to the illegal detention". *(Supra,* at 402.) Therefore, the revolver, disclosed as a result of defendant's independent act, was not tainted by prior illegality. However, if the evidence was revealed as a direct consequence of the unlawful police action, the evidence is tainted and must be suppressed on defendant's motion. *(See, e.g., People v Wilkerson,* 64 NY2d 749 [1984]; *People v Butterly,* 25 NY2d 159 [1969]; *Rios v United States,* 364 US 253 [1960].)

Turning to the case before us, we conclude that defendants were startled by the police officers' abrupt and menacing order. Their conduct was a direct result of the illegal police action. Since the production of the evidence was a spontaneous, provoked reaction to that illegality, the evidence was tainted. *(People v Wilkerson, supra,* at 750; *People v Boodle, supra,* at 403.)

In sum, the discovery of the contraband was clearly a direct and immediate product of the illegal seizure of defendants and, therefore, should be suppressed. Accordingly, the order of the hearing court should be affirmed.