■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KEVIN DICKERSON, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Hellenbrand, J.), rendered June 11, 1987, convicting him of attempted criminal possession of a weapon in the third degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress a firearm.

Ordered that the judgment is reversed, on the law and the facts, that branch of the defendant's omnibus motion which

was to suppress the firearm is granted, the indictment is dismissed, and the matter is remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

On appeal, the defendant contends that the hearing court erred in denying that branch of his omnibus motion which was to suppress a gun seized by police officers from his person prior to his arrest. We agree. The testimony adduced at the suppression hearing established that at approximately 10:00 P.M. on November 8, 1986, Officers McCarthy and Maloy received a radio call to respond to shots fired at a six-story apartment building located at 270 Pulaski Street in Brooklyn. No description of a suspect was provided. Upon arriving at the scene, the uniformed officers entered the lobby of the building and encountered several individuals, who, in response to the officers' inquiry as to whether they had heard any noises, directed the officers upstairs to the fifth floor. The officers entered the stairwell of the building and, as they reached the fifth-floor landing, observed the defendant descending the stairs from the sixth floor. The defendant, who was wearing a blue vinyl jacket, was carrying a grocery bag in his right arm. Although Officer Maloy did not notice anything unusual about the defendant's jacket, Officer McCarthy stated that she observed that the defendant's jacket was "lopsided" and was "hanging low" on the right side. Contrary to the hearing court's finding, Officer McCarthy did not testify that she observed a "bulge" in the defendant's jacket. Moreover, the officer acknowledged that she did not observe an outline of a gun.

Upon encountering the defendant, the officers requested that he stop and they attempted to ask the defendant questions about the alleged shooting. The defendant refused to answer the officers' questions and proceeded to attempt to pass by the officers on the stairs. At that point, Officer McCarthy grabbed the defendant's arm. The defendant responded by dropping his bag of groceries and running up the stairs. The officers immediately grabbed the defendant and Officer McCarthy, upon feeling a hard object in the defendant's right jacket pocket, reached into the pocket and retrieved a revolver. The defendant was then placed under arrest. During this time, the defendant was yelling that he lived in the building.

It is well established that in the absence of any concrete indication of criminal activity, a police officer may approach a private citizen in a public area for the purpose of investigation if he or she can point to specific and articulable facts which

support a suspicion that criminal activity is afoot *(see, People v De Bour,* 40 NY2d 210). However, while the officer may have a right to inquire, the individual also has "a constitutional right not to respond" *(People v Howard,* 50 NY2d 583, 590). Moreover, in exercising this common-law right of inquiry, the officer may not exercise restraint over the individual *(see, People v Harrison,* 57 NY2d 470, 476; *People v Tolliver,* 145 AD2d 660). Actual or constructive restraint may only be exercised over an individual if there are "some articulable facts, which initially or during the course of the encounter, establish reasonable suspicion that the person is involved in criminal acts or poses some danger to the officers" *(People v Harrison, supra,* at 476).

In the case at bar, it is clear that the officers had a sufficient basis upon which to approach the defendant and inquire as to his knowledge, if any, of the report of gunshots based upon the information provided in the radio transmissions as well as the statements made by the individuals in the lobby. However, there is no basis in the record to indicate that the officers had reasonable suspicion that the defendant was involved in criminal activity or was armed and dangerous *(see, People v Carrasquillo,* 54 NY2d 248). Although Officer McCarthy testified that the defendant's jacket was "lopsided" and was "hanging low" on the right side, she did not observe a bulge or an outline of a gun *(cf., People v Trulio,* 135 AD2d 758; *People v Tolliver, supra).* Moreover, the radio transmission did not include a description of a suspect which might have provided the officers with a basis to believe that the defendant was armed and dangerous *(see, People v Salaman,* 71 NY2d 869). The fact that the defendant attempted to pass the officers by on the stairwell following his refusal to answer their inquiry did not provide a basis to detain him since the defendant was not obligated to remain and respond to the officers' questions. The only proper response which the police officers could have made under the circumstances would have been to continue their observation of the defendant provided they did not limit the defendant's freedom of movement *(see, People v Howard, supra,* at 592). By grabbing the defendant's arm and preventing the defendant from continuing down the stairs, in the absence of reasonable suspicion that he was involved in the criminal activity, the police officers acted improperly and in violation of the defendant's constitutional rights. Accordingly, the gun seized as a result of the stop and frisk should have been suppressed. Mollen, P. J., Spatt and Sullivan, JJ., concur.

Rosenblatt, J., dissents and votes to affirm the judgment appealed from, with the following memorandum: There is credible evidence to support the hearing court's findings that shortly after 10:00 P.M. on November 8, 1986, the two police officers on radio motor patrol drove to 270 Pulaski Street in Brooklyn, where gunshots were reported. I stress at the outset that we are dealing here with guns, and not with other types of confrontations commonly involved in stop and frisk cases, such as suspicious-looking people who may be stealing or engaging in drug trafficking (e.g., *People v Howard,* 50 NY2d 583; *People v Michael,* 152 AD2d 752; *People v Mann,* 143 AD2d 200; *People v Tucker,* 140 AD2d 887; *People v Mateo,* 122 AD2d 229). In those situations the safety factor may escalate, depending upon the circumstances, so as to eventually justify pat downs or frisks *(People v De Bour,* 40 NY2d 210), but it does not exist at the outset, as it does when reports of guns are involved.

From the inception, the police were engaged in a venture of the highest risk to their lives and safety. Concededly they had no description of the person responsible for the gunshots, but it would be a mistake to suppose that under these circumstances the absence of identification, in itself, made their entry into the confines of the building any less hazardous. Police may be shot by identified as well as unidentified people. That they did not know the appearance of the protagonist is but one factor to be considered, and is at least counterbalanced by other conditions, including the highly circumscribed area involved. By entering the building in which gunshots were said to have been fired, the police were in an arena no less dangerous—and very likely more so—than the "high crime area" that is so often advanced as a factor in weighing the reasonableness of their conduct *(e.g., People v Green,* 133 AD2d 170; *People v McCall,* 128 AD2d 552; *People v Wallace,* 122 AD2d 238).

When the police arrived at the building they encountered two or three young people in the lobby. The police asked them if anything was going on and whether they had "hear[d] any shots". They said yes, and directed the police to the "fifth floor". This confirmation heightened the level of risk and isolated the zone of danger to an area vastly smaller than the high-crime localities measured by blocks and even neighborhoods. When the police ascended the stairs they encountered the defendant, and only the defendant, at the fifth-floor stairwell. He was carrying a bag, in which the police could see groceries. The hearing court further found that one of the

officers said that the right-side pocket of the defendant's jacket was sagging lower than the left side, and that when the police ordered the defendant to stop, he refused, and tried to brush past. A scuffle ensued when the police attempted to keep him there. The defendant started to run upstairs, and as the police held him one of them quickly patted down the jacket and felt what turned out to be a revolver.

This kind of encounter should be judged in the context of the volatile setting in which it occurred. Police officers "must be permitted to take reasonable measures to assure their safety and they should not be expected 'to await the glint of steel' before doing so" (People v Allen, 73 NY2d 378, 380). The encounter with the defendant was at least as suggestive of the need for police safety and protection as the legions of nervous, erratic, or "furtive" movements of individuals that have, in less dangerous situations, justified frisks and pat downs (see, People v Grey, 134 AD2d 613; People v Lopez, 94 AD2d 627;. People v Reyes, 91 AD2d 935).

Notably, the police had not drawn their guns, yet were acting in the face of a rapidly unfolding scene, in an encounter with the only person in the relatively isolated vicinity in which gunshots had reportedly been fired. The background facts and the confirmed report of a gun readily distinguish this case from those in which a furtive movement could have a far more innocent connotation (e.g., People v Howard, 147 AD2d 177). Under the circumstances, the degree of peril far exceeded the exigencies described in People v Torres (74 NY2d 224), People v Gutierrez (129 AD2d 463), and our recent case of People v Flores (144 AD2d 481), which provide ample legal support for the hearing court's determination. The actions of the police in frisking the defendant's jacket were fully justified, and the result of that pat down should not be suppressed (see, People v Palmer, 140 AD2d 720; People v Clee, 89 AD2d 188, 190-191; People v Fernandez, 86 AD2d 416, affd 58 NY2d 791; People v Rivera, 78 AD2d 327).