OPINION OF THE COURT
Lewis L. Douglass, J.
The question to be decided is what action may uniformed police officers take, when a person they observe in the vicinity of a drug location, for a period of time, runs away when the police approach to ask the person for an explanation of his presence at the location.
The facts which produce the question arise out of what is an ever increasing encounter between police, who, in response to community demands to do something about the drug problem, make their presence known at the local "crack house” and then question the people who seem to be connected to the operation.
At the suppression hearing the officer testified, that based on intelligence reports, he knew this particular storefront to *1003 be a drug operation. The official sounding term "intelligence reports” in all probability really means that every uniformed police officer in the precinct and the entire community knew that this plexiglass location was where drugs were being sold.
The officer testified that while on routine patrol in a marked police car, he saw the defendant enter a storefront. The officer and his partner exited their car and also entered the storefront, where they saw the defendant standing by a plexiglass partition with his hands inside a slot in the plexiglass partition. When the officer asked the defendant what he was doing, the defendant "couldn’t give a specific reason” and he left. The officers also left and parked a half a block away, and while parked, they saw the defendant reenter the location, and after a few seconds, leave.
At this point, it is fair to infer that everyone on the block knew the police were out, and everyone was wondering what would happen. Would the police do something, or would they simply sit in their car while this drug operation continued.
When the officers saw the defendant leave the building, after reentering and leaving, following the first encounter between the defendant and the police, they left the car and started walking toward the defendant. Upon their approach, the defendant ran down an alley. The officers pursued. With the officers in pursuit, the defendant climbed a fence and while on the fence pulled a gun. The officers shouted "stop”, the defendant dropped the gun and was eventually subdued.
The defendant now moves to suppress the gun and cites, what at first blush appears to be fundamental New York law. The defendant argues that the police only saw a person in a store, open to the public, doing nothing wrong and, thus, there were no "articulable facts” suggesting that criminal activity was "afoot”. And even though the police have a common-law right to approach a citizen, because there were no articulable facts of criminal activity, the defendant had " 'a constitutional right not to respond’ (People v Howard, 50 NY2d 583, 590). Moreover, in exercising this common-law right of inquiry, the officer may not exercise restraint over the individual” (People v Dickerson, 153 AD2d 897, 899).
The issue here is whether Howard, Dickerson (supra) and other cases which suggest that even when police officers enter a building, following reports of shots fired, and see people in stairwells (see, e.g., People v Lawrence, 145 AD2d 375), these people cannot be stopped even if they flee, are applicable to *1004 situations like this, where the police watch a person who seems to have a connection with a known drug location.
Analysis of the exclusionary rule begins with the recognition that "the standard to be applied is that of reasonableness, the touchstone of the Fourth Amendment * * * '[i]t must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.’ ” (People v Finlayson, 76 AD2d 670, 675.)
In order to protect citizens from "unreasonable” searches the courts developed the exclusionary rule, whose primary purpose is the deterrence of future unlawful police activity, even if the price for deterring the future unlawful activity means that a criminal will go free. (People v Drain, 73 NY2d 107.) The test of what is unreasonable, i.e., what conduct is so unlawful that it is better that a criminal go free, rather than permit repetition of the conduct, is not determined against the calm of a courtroom, but rather, in making the determination of what is reasonable the law deals with "not technicalities]” but with "practical considerations of everyday life”. (Brinegar v United States, 338 US 160, 175.) Not only does the law deal with "practical considerations”, but the standard of reasonableness changes as the needs of society change. Thus, for example, at one point in our history courts held that the passing of a glossine envelope would not rise to the level of probable cause, but as the drug epidemic exploded, the standard was changed so that the law in People v McRay (51 NY2d 594) came to recognize that the passing of a glossine envelope is the "hallmark” of the drug trade. Moreover, the drug explosion has moved the Appellate Division, relying on McRay (supra), to caution Trial Judges to consider the "totality of the circumstances” and temper their decisions "by a realistic perception of the 'present day culture’ ” (People v Thomas, 143 AD2d 696, 699).
In attempting to determine whether Howard’s recognition of the right to run away and Dickerson’s prohibition of stops in hallways of apartments are applicable to what action police officers can take when they observe a person in and around a drug location, the question is what was the evil, that is, what unreasonable activities were the courts trying to discourage. In Howard, Dickerson type of cases (supra), the encounter between the citizen and the police was brief, so that the police could not form any opinion about criminal activity. If those stops were not condemned, it would mean that whenever a citizen happens to be in his or her hallway, and someone else *1005 calls the police, that person could be stopped and searched, or a person walking on a public street could be stopped and searched, based on the most fleeting observation by the police. Permitting these stops would open the door to unreasonable intrusion by the police and the right of people "to be left alone” when they are doing nothing wrong. But that risk does not exist here. In this case, the defendant was not a casual passerby, but rather, he had been under police observation in the area of this drug location for a period of time.
Because of the defendant’s continued presence at the drug location and recognizing the realities of the present drug epidemic, when the police approached the defendant to ask him questions, his flight created a reasonable suspicion that some criminal activity was afoot. The police were not, under these circumstances, obligated to close their eyes to that possibility, and indeed, were required to take appropriate action, which could include pursuit and apprehension.
This is not to suggest that the law and our tradition of curtailing unreasonable arrests should be abandoned because of the current drug epidemic. The law still condemns generalized sweeps, arrests made as subterfuges, unwarranted physical abuse, arrests based on race or class, but where the encounter is free from unreasonable police conduct, rulings at suppression hearings, in absence of clear constitutional commands, should not lead to the perception that the police neither have the will nor the capacity to respond to the country’s current drug epidemic.
Since I conclude that the defendant’s flight from a known drug location, in response to the approach by the police, clearly suggests that the defendant was involved in criminal activity, and since the police acted reasonably under the circumstances, this motion is denied.